IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JERRY FLOYD INGRAM, JR.                                                    PLAINTIFF

v.                          5:15-cv-05068

SHERIFF TIM HELDER; NURSE JUDY
MADEWELL; NURSE RHONDA S. BRADLEY;
DR. SAEZ; NURSE REGINA CAMPBELL; AND
JANE DOE NURSES                                                            DEFENDANT


**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983. The Plaintiff, Jerry Floyd Ingram, Jr., proceeds *pro se* and *in forma pauperis*. The defendants in this action include Sheriff Tim Helder, Nurse Judy Madewell, Nurse Rhonda S. Bradley, Dr. Roberto Saez, and Nurse Regina Walker. The claims against the Defendants are with respect to their personal capacity only.

Ingram is incarcerated in the Washington County Detention Center (WCDC); and, his claims in this action concern his confinement there. Ingram asserts that the Defendants violated his constitutional rights by distributing outdated medication to him; and, by refusing to give him certain medications prescribed to him by his doctor.

Separate Defendants Roberto Saez, M.D., Judy Madewell, Rhonda Bradley, and Regina Walker's Motion for Summary Judgment (Doc. 21) was filed on August 19, 2015. Sheriff Tim Helder's Motion for Summary Judgment (Doc. 24) was filed on September 23, 2015. A hearing was held on November 12, 2015, to allow Ingram to respond to the motions. During the hearing,

-1-

Ingram informed the Court that he would like to submit certain WCDC policies and procedures concerning the administration of medication as an exhibit for the Court's consideration. Ingram filed an excerpt from the Southern Health Partners Policy and Procedure Manual for Health Services in Jails on November 23, 2015 (Doc. 32). In addition, during the hearing, the Court requested supplemental information from the Defendants in the form of affidavits from certain defendants regarding Ingram's treatment at the WCDC. On November 20, 2015, both the Supplemental Affidavit of Judy Madewell (Doc. 30) and the Supplemental Affidavit of Roberto Saez, M.D. (Doc. 31) were filed. The motions are now ready for decision.

**Background**

Jerry Floyd Ingram, Jr. was booked into the WCDC on January 12, 2015, following a car accident, on charges of fleeing, possession of drug paraphernalia, and driving while intoxicated on drugs. (Doc. 26, Ex. A-1,[1] Pg. 16). Upon intake, Ingram had no medications with him but reported that he took certain medications that were not on his person. (Doc. 26, Ex. A-1, Pg. 2). Ingram was also charged with a violation of his parole. (Doc. 26, Ex. A-1, Pg. 18).

On January 13, 2015, Ingram answered a series of medical questions which were recorded on a Medical Staff Receiving Screening Form. (Doc. 26, Ex. A-1, Pg. 19). Ingram identified his doctor, described his medical conditions, and listed the medications he claimed to be taking. (Doc. 26, Ex. A-1, Pg. 19).

On January 13, 2015, Ingram made four separate requests on the kiosk system. In those requests, Ingram asked if his medication was received from his home; and, stated that he was in a lot of pain from his wreck and asked for ibuprofen and an antibiotic for a busted lip. (Doc. 26,

---

[1] Exhibit A-1 to Document 26 will be identified by the Ingram Jail File page numbers.

Ex. A-1, Pg. 68). Nurse Rhonda Bradley responded to the requests on January 14, 2015, "added to nurse call." On January 15, 2015, Judy Madewell further responded to Ingram's requests: "Your medication is not here from home. The release of information was sent to your providers for documentation of medications. You are on my list for next week. If it is a psychiatric emergency, please respond and also let the officers know. Other than pysch meds will be addressed by medical nurse." Nurse Bradley then noted on January 17, 2015, "seen". (Doc. 26, Ex. A-1, Pg. 68).

On January 14, 2015, Ingram signed a consent for treatment which indicated he agreed to the release of his records and that he had been made aware of how to request medical services while incarcerated. (Doc. 26, Ex. A-1, Pg. 22).

On January 16, 2015, medical records for Ingram were received from Community Clinic and the Northwest Medical Center - Springdale. (Doc. 26, Ex. A-1, Pg. 24-38).

On January 17, 2015 and January 22, 2015, Ingram's blood pressure was checked. (Doc. 26, Ex. A-1, Pg. 56).

On January 22, 2015, Ingram made another request that he be given a phone call to his brother to ask him to bring his medication. Nurse Bradley responded on January 23, 2015: "I will check into a phone call for you." (Doc. 26, Ex. A-1, Pg. 70).

On January 23, 2015, Ingram again requested a phone call. Jeb Byrd responded on January 24, 2015: "If you will give the list of medications you need and a phone number we can make the call for you." (Doc. 26, Ex. A-1, Pg. 71). Later on January 24, 2015, Ingram stated, "My brother brought my medication tonight, do you know about when I will start my meds back?" And, again on January 25, 2015, "I would like to be given my depression medication

bupropion . . . welbutrin . . .I was also suppose to be given my antianxiety meds when my paperwork came back from my doctor, it should be back by now. Thank you." On January 26, 2015, Rhonda Bradley responded, "I will check into this." (Doc. 26, Ex. A-1, Pg. 71).

On January 24, 2015, Dr. Saez ordered that Ingram's home meds be continued as ordered. (Doc. 26, Ex. A-1, Pg. 47).

On January 28, 2015, Ingram wrote: "I had my family bring most of my medications up here, and I am not receiving them? I was told on my request that it would be looked into, I am also needing another medication renewed it is my gabapinton Dr. Gains at the Community Clinic had me taking 800 mg. 3 times a day. Can you please check on my medications Welbutrin, for my depression, and my anxiety meds. I am in dire need of them, do I have to beg for something that I was prescribed by a medical doctor? Please help me in these matters Thank you." On January 29, 2015, Rhonda Bradley responded "I will check into this." (Doc. 26, Ex. A-1, Pg. 73).

Ingram testified that when the nurse did distribute his home medications, the ones that she gave him were out of date. Ingram testified that he told the nurse that the medications were old. Ingram testified that he did not know if there was an expiration date on the pill bottles of his home medications. Ingram testified that although he did not suffer "bad" side effects of the expired drugs, they made him nauseous.

Ingram also testified concerning the effects he suffered from not receiving his medications for a period of time at the beginning of his incarceration. He testified that he suffered anxiety attacks, shaking, and bipolar mood swings. He testified that without his medication "I get hateful" and have trouble coping.

On January 31, 2015, Ingram wrote, "I still am not getting medication for my anxiety, the hydroxizine does not work for me thats why the doctor put me on something stronger, its all in my records and also this doctor here at this jail pre incarcerations has given me both valium as well as xanex, my condition has not improved . . . Please help me in this matter . . . I am in need of something for my anxiety . . . Thank you." Nurse Bradley responded on February 2, 2015: "Will add to Psych Nurse list." On February 3, 2015, Ingram responded "I have already seen the nurse, we were just awaiting my records to come back from my doctor so that I could be given something that actually works on me thank you." Later on the 3rd, Nurse Bradley responded "As soon as we receive your records a decision can be made." (Doc. 26, Ex. A-1, Pg. 74).

On February 4, 2015, Ingram was seen by Nurse Madewell and was encouraged to learn about his medications. (Doc. 26, Ex. A-1, Pg. 60).

On both February 4, 2015, February 11, 2015, and February 13, 2015, Ingram again complained about the anxiety medications he was being given. (Doc. 26, Ex. A-1, Pg. 77, 79, 80). He complained that he was not receiving the prescriptions prescribed to him by his doctor of choice, Dr. Gains at Springdale Community Clinic. (Doc. 26, Ex. A-1, Pg. 79, 80). Nurse Regenia Walker responded on February 17, 2015, "Sir, you have been seen by the Psych nurse and the Dr. at WCDC and you are receiving the medication they wrote scripts for." (Doc. 26, Ex. A-1, Pg. 80).

On February 6, 2015, Ingram was seen by Dr. Saez. (Doc. 26, Ex. A-1, Pg. 59).

On February 8, 2015, Ingram was evaluated by Nurse Regenia Walker regarding his medical history. Ingram was also screened for TB. (Doc. 26, Ex. A-1, Pg. 50-51).

-5-

On February 12, 2015, Ingram met with Nurse Madewell and was upset concerning his medications. (Doc. 26, Ex. A-1, Pg. 60). Nurse Madewell left a message with and sent a fax to Community Clinic in Springdale concerning estrogen. (Doc. 26, Ex. A-1, Pg. 61).

On February 14, 2015, Ingram requested his "own personal stomach medication in my bag on the pill cart." Nurse Bradley responded, "on nurse call." (Doc. 26, Ex. A-1, Pg. 80).

Ingram complained on February 17, 2015, that he was not receiving his "psychiatric medication prescribed to me by my doctor of choice, Dr. Gains, at Springdale Community Clinic." Nurse Bradley responded on February 19, "Sir, you have seen the Dr. and an order for your medication you requested was not written." (Doc. 26, Ex. A-1, Pg. 80).

On February 20, 2015, Ingram made the same request. After James Morse referred the request to medical services, Loni Plumlee responded on March 5, 2015, "We received records and the jail doctor has reviewed them. Your records indicate a short term treatment with a controlled medication but the medication was not prescribed for long term use. While in the custody of the Washington County Jail, the jail physician determines what medications can be continued. You are currently receiving all of the medications that have been approved based on your medical history." (Doc. 26, Ex. A-1, Pg. 82-83).

On February 24, 2015, Dr. Saez ordered that Ingram continue his home meds including Omeprazole. (Doc. 26, Ex. A-1, Pg. 57).

On February 25, 2015, Ingram again complained about his psychiatric medication. James Morse responded and then forwarded the request to medical services: "Mr. Ingram your medical grievances have been addressed and responded to by medical services and they are aware [of] your concerns and I will once again defer this grievance to them to specifically explain your

situation." Loni Plumlee responded on March 5, 2015: "While in this facility your care is managed by the jail physician. You are currently on all medications that were approved by the doctor." (Doc. 26, Ex. A-1, Pg. 84).

On February 28, 2015, Ingram complained about a denial of his psychiatric medication prescribed by Dr. Gains. Ingram also complained that "Ms. Judy" okayed "the nursing staff to give me out of date medication . . . hydroclorizide/which was discontinued by Doctor Gains, and Mrs. Kimberly Shuler at Springdale Community . . ." Judy Madewell responded on March 4, 2015, "I sent the release of information and called regarding one medication and have not received anything back. I am adding you to the MD list." (Doc. 26, Ex. A-1, Pg. 85).

On March 4, 2015, Ingram was seen by Dr. Saez, who refilled his Clonezapam. (Doc. 26, Ex. A-1, Pg. 57, 59).

On March 12, 2015, Ingram complained, "I need to see a doctor about hormone therapy, testoterone blockers/estregen . . .the doctor told me I need to see a specialist, please set up the appointment thank you." On March 19, 2015, Loni Plumlee responded, "I have reviewed your medical chart and I see no doctor orders referring you for an outside appointment with a specialist." (Doc. 26, Ex. A-1, Pg. 86).

Sheriff Helder testified that he was not personally involved in any of the incidents surrounding Ingram's claims. (Doc. 26, Ex. B). Ingram testified that he never spoke with Sheriff Helder face to face and that Sheriff Helder never answered his grievances. (Doc. 26, Ex. C).

On November 20, 2015, at the direction of the Court, the Supplemental Affidavit of Judy Madewell was filed. (Doc. 30). According to Madewell's affidavit, Ingram was ordered the following drugs:

 * on January 24, 2015, Indomethacin 50 mg twice a day, for pain;

 * on January 24, 2015, Vistaril 50 mg twice a day, to relieve anxiety;

 * on January 24, 2015, Amlodipine 10 mg once a day, for hypertension; and,

 * on January 28, 2015, Wellbutrin 150 mg twice a day, to relieve depression and anxiety.

Ingram also began receiving the following drugs:

 * on February 6, 2015, Gabupentin 900 mg twice a day, for the relief of pain and anxiety;

 * on February 24, 2015, Omeprazole 20 mg once a day, to relieve acid reflux; and,

 * on March 6, 2015, Citalopram 20 mg once a day, for the relief of depression and anxiety.

Ingram continued each of the above drugs through the date of his Complaint. (Doc. 30).

 Also on November 20, 2015, and also at the direction of the Court, the Supplemental Affidavit of Roberto Saez, M.D. was filed. (Doc. 31). According to Dr. Saez's affidavit, Saez, Ingram's primary care physician while housed at the WCDC, physically saw and evaluated Ingram on the following dates: February 6, 2015, March 6, 2015, May 1, 2015, May 22, 2015, July 17, 2015, and October 30, 2015. Saez states that:

 * Ingram began receiving "his home (free world) medications" on January 24, 2015, specifically, Amlodipine 10 mg for blood pressure, Indomethacin 50 mg twice a day for pain relief, and Vistaril (Hydroxyzine) 50 mg twice a day for anxiety;

 * On January 28, 2015, Saez ordered that Ingram also be placed on Wellbutrin 150 mg, twice a day, for depression;

* On February 6, 2015, Saez saw Ingram because he was complaining of pain, anxiety, and depression. Saez added Gabapentin 900 mg twice a day for pain and ordered the continuance of Vistaril;

* On February 24, 2015, Saez ordered Omeprazole (Prilosec) 20 mg by mouth every day for acid reflux; and,

* On March 6, 2015, Saez saw Ingram for hormone therapy, depression and anxiety. All of his prescribed medications were continued. In addition, Ingram was prescribed the antidepressant Citalopram 20 mg daily. (Doc. 31).

Saez states: "[d]uring the course of my treatment of Jerry Floyd Ingram, Jr., I ordered such antidepressants as Citalopram, Wellbutrin, and Effexor because they also provide some anti-anxiety benefits. Gapapentin also has some anti-anxiety benefits. I also prescribed increasing doses of Vistaril to alleviate Jerry Floyd Ingram, Jr.'s anxiety. I also prescribed Estrogen to help reduce Jerry Floyd Ingram, Jr.'s anxiety." (Doc. 31).

Saez states: "Klonopin is in a class of drugs called benzodiazepines. I did not prescribe Klonopin because benzodiazepines are drugs of choice for abuse in correctional settings. In my professional opinion, there were other safer medications that could be used to treat Jerry Floyd Ingram, Jr.'s anxiety." (Doc. 31).

Saez states: "In my professional opinion, in addition to the medications that he is presently receiving, Jerry Floyd Ingram, Jr. would benefit from counseling sessions with a psych nurse to assist with his coping skills. Jerry Floyd Ingram, Jr. has not been receptive to counseling." (Doc. 31).

AO72A
(Rev. 8/82)

Saez states: "At all times, I have used sound professional judgment when I prescribed medications for Jerry Floyd Ingram, Jr.'s various medical and psychological needs." (Doc. 31).

Saez states: "While housed at Washington County Detention Center, Jerry Floyd Ingram, Jr. was administered appropriate medications for his hypertension, depression and anxiety, and all other medical and psychological issues reported by him." (Doc. 31).

On November 23, 2015, Ingram filed the Policy and Procedure Manual for Health Services in Jails. (Doc. 32). The Policy and Procedure Manual notes "It is very important to note inmate patients should never go without needed/ordered/prescribed medication." (Doc. 32).

**Summary Judgment Standard**

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "A case founded on speculation

-10-

or suspicion is insufficient to survive a motion for summary judgment." Id. (citing, Metge v. Bachler, 762 F.2d 621, 625 (8th Cir. 1985)).

**Discussion**

As stated above, Ingram claims that his constitutional rights were violated because the defendants distributed outdated medication to him and refused to give him certain medications prescribed to him by his doctor. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." County of Sacramento v. Lewis, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). In Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006), the Eighth Circuit held that deliberate indifference is the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety."

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" Jolly, 205 F.3d at 1096 (quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th

AO72A (Rev. 8/82)

Cir.1995)).  See also Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Hudson v. McMillian, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" Schaub v. VonWald, 638 F.3d 905, 914 (8th Cir. 2011)(citing Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995)).

### Sheriff Tim Helder

Sheriff Tim Helder argues that he is entitled to summary judgment with respect to Ingram's claims against him. Ingram asserts personal capacity claims against Sheriff Helder. Sheriff Helder asserts that Ingram failed to exhaust his administrative remedies with respect to any claim against him, and that Ingram failed to allege any actions or omissions by Sheriff Helder personally. Finally, Sheriff Helder argues that he is entitled to qualified immunity with respect to any claim against him.

Neither the jail records nor Ingram's testimony include allegations of personal actions or omissions by Sheriff Helder. Further, the allegations and proof presented do not include any grievances concerning any personal actions or omissions of Sheriff Helder. "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights" protected by the Constitution. Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990).

Because the complaint, and Ingram's testimony, fail to set forth specific allegations concerning *any* actions of Sheriff Helder, I find that the complaint against him should be dismissed.

In addition, I find that Sheriff Helder is clearly entitled to qualified immunity as a matter of law on Ingram's claims against him. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, ____ (2011). As set forth above, with respect to Sheriff Helder, Ingram's allegations fail to set forth a clear constitutional violation as a matter of law.

**Delay in Home Medications**

Ingram's claims include his allegations that he was denied medication for a period of time at the beginning of his incarceration. This period clearly includes at least January 12, 2015 until January 24, 2015. Although the jail records show orders for Ingram to begin receiving his home medications on January 24, 2015, Ingram testified, and Ingram's grievances reflect, that he did not begin receiving at least some of his home medications until approximately January 28 or January 29, 2015.

When Ingram was admitted into the WCDC on January 12, 2015, he reported that he took certain medications that were not on his person. (Doc. 26, Ex. A-1, Pg. 2). Ingram identified his doctor, described his medical conditions, and listed the medications he claimed to be taking. (Doc. 26, Ex. A-1, Pg. 19). Beginning January 13, 2015, Ingram made multiple requests for his prescribed medications. (Doc. 26, Ex. A-1, Pg. 68). WCDC requested Ingram's medical records and received the records from Community Clinic and Northwest Medical Center - Springdale

on January 16, 2015. (Doc. 26, Ex. A-1, Pg. 24-38). Although Dr. Saez ordered continuation of his home medications on January 24, 2015, Ingram again complained of not receiving medications on January 28, 2015 and testified that he did not receive those medications until January 28 or 29. (Doc. 26, Ex. A-1, Pg. 73). The defendants have provided no explanation for this delay.

Because the facts presented, including the undisputed delay in WCDC's receipt of Ingram's medical records on the 16th and Ingram's first dose of prescription drugs, could support a claim that the defendants were deliberately indifferent to Ingram's serious medical needs, I find that summary judgment is not appropriate with respect to Ingram's claim concerning the denial of prescription medication at the beginning of his incarceration. In addition, I find that the defendants are not entitled to qualified immunity with respect to this claim as Ingram has set forth facts that could support denial of a clearly established constitutional right.

**Out of Date Medication**

Ingram also complains that when he was distributed his home medications, some of the medication distributed was out-of-date. Ingram testified that he experienced nausea as a result of the out-of-date medications. Ingram further testified that he does not know if there was an expiration date on the medication bottles.

In her affidavit, Separate Defendant Judy Madewell asserted that although Ingram's home medications were re-started on January 24, 2015, the medications Ingram received were obtained from the WCDC pharmacy and were not the actual pills from his home. (Doc. 22, Ex. 2). Madewell further stated that she does not believe Ingram received any of the actual pills from his home and that she was not award that the pills from his home were out-of-date. (Doc. 22,

Ex. 2). Separate Defendants Rhonda Bradley and Regina Walker likewise asserted that they did not believe Ingram's home medications were out-of-date. (Doc. 22, Ex. 4, Ex. 5). Finally, Madewell asserted that a review of Ingram's medical chart and health care requests show that Ingram never complained to the nursing staff concerning ill effects from receiving out-of-date medication. (Doc. 22, Ex. 2).

Based on the lack of evidence of deliberate indifference concerning the alleged distribution of out-of-date medication, the Court finds that summary judgement should be granted with respect to Ingram's claims concerning the distribution of out-of-date medication.

In addition, I find that the defendants are entitled to qualified immunity as a matter of law on Ingram's claims concerning out-of-date medications. As set forth above, with respect to his allegations concerning out-of-date medication, Ingram fails to set forth a clear constitutional violation as a matter of law.

**Preferred Medications / Treatment**

Finally, Ingram complains that he did not receive certain prescriptions prescribed to him by his "doctor of choice." Specifically, Ingram complains that Dr. Saez refused to order the administration of Klonopin for anxiety. Ingram asserts that he had been prescribed Klonopin prior to his incarceration and that Dr. Saez's refusal "to allow me to have medication prescribed to me by my physician of choice" caused him "to suffer severely."

According to the records, and the Supplemental Affidavit of Roberto Saez, M.D., on January 24, 2015, Dr. Saez ordered Ingram continue his home medications: Amlodipine for blood pressure, Indomethacin for pain relief, and Vistaril for anxiety. (Doc. 31). On January 28, 2015, Dr. Saez added Wellbutrin for depression to Ingram's orders. On February 6, 2015,

-15-

following complaints of pain, anxiety, and depression, Dr. Saez added Gabapentin for pain relief. Dr. Saez notes that he specifically did not prescribe Klonopin because, in his professional opinion, there were other safer medications that could be used to treat Ingram's anxiety. (Doc. 31).

It is clear that "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000). Dr. Saez treated Ingram with several drugs aimed at anxiety relief. (Doc. 31). The undisputed facts simply do not present a situation "so inappropriate as to evidence intentional maltreatment." Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990). For those reasons, summary judgment should be granted with respect to Ingram's preferred medication claim.

Further, I find that the defendants are entitled to qualified immunity as a matter of law on Ingram's claim concerning his preferred medication. As set forth above, with respect to his claim that he was not treated with the medication prescribed by his "doctor of choice," Ingram's allegations fail to set forth a clear constitutional violation as a matter of law.

**Conclusion**

For the reasons above, I recommend that Sheriff Tim Helder's Motion for Summary Judgment (Doc. 24) be **GRANTED** and this case dismissed with prejudice with respect to all claims against Sheriff Helder.

In addition, I recommend Separate Defendants Roberto Saez, M.D., Judy Madewell, Rhonda Bradley, and Regina Walker's Motion for Summary Judgment (Doc. 21) be **GRANTED, IN PART** and **DENIED, IN PART** as follows:

  * the Motion should be **GRANTED** with respect to Ingram's claims concerning his alleged receipt of out-of-date medications and the denial of his preferred medication;

  * the Motion should be **DENIED** with respect to Ingram's claim concerning his delay in receipt of prescription medication after his intake date.

  **The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

  DATED this 21st day of December, 2015.

                /s/ *Erin L. Setser*
                HON. ERIN L. SETSER
                UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)